UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

_____
                                        )
DOWNING/SALT POND PARTNERS, L.P.,       )
                                        )
          Plaintiff                     )
                                        )
     v.                                 )     CA. No. 09-387 S
                                        )
STATE OF RHODE ISLAND, et al.,          )
                                        )
          Defendants.                   )
_____)

**AMENDED OPINION AND ORDER**

WILLIAM E. SMITH, United States District Judge.

In 1992, Plaintiff Downing/Salt Pond Partners, L.P. ("Downing") obtained a permit to develop some land it owns along the coast of Rhode Island for residential purposes. In this action, it accuses various State agencies and officials of blockading development of the site. Through formal and informal measures, including the issuance of a stop-work order and refusal to clarify the status of the permit, Defendants have accomplished a de-facto "taking" of the property without just compensation, according to Downing's Complaint. Downing also raises a handful of other constitutional and state law claims. Defendants have moved to dismiss the case for lack of subject matter jurisdiction.

In spite of all the bureaucratic hijinx enwrapping the controversy, the current motion raises a classic procedural

feint that, at its core, turns on whether a recent First Circuit case expanded federal jurisdiction over takings claims sufficiently to encompass this action. Because this Court concludes that the case in question, Asociacion De Subscripcion Conjunta Del Seguro De Responsabilidad Obligatorio v. Flores Galarza, 484 F.3d 1, (1st Cir. 2007), did not reconfigure the law in this Circuit in the way that Downing suggests, the Complaint must be dismissed.

I.  Background

Downing owns a 67-acre residential subdivision in the town of Narragansett, Rhode Island called Salt Pond Residences. In 1992, the Rhode Island Coastal Resources Management Council ("CRMC") issued a land use permit, known as an "Assent," for the property allowing the development of 79 single family houses. Downing has built 26 homes and started work on infrastructure for the remaining lots. (See Compl. ¶¶ 13-14.)

Recently, the Rhode Island Historic Preservation and Heritage Commission ("HPHC") became interested in Downing's property as the possible historical site of a settlement of the Narragansett Tribe. Apparently at the behest of HPHC, CRMC informally asked Downing to cease construction. It sent a letter in August 2007 stating that the Assent "remains valid pending a determination" on the historical and cultural issues raised by HPHC. (Compl. ¶ 25(a).) After negotiations about how

to resolve the problem failed, Downing made numerous formal requests for a decision about the status of the Assent. Yet, for over a year, CRMC stonewalled these inquiries, refusing to provide any response at all, let alone make a final "determination."

In June 2009, Downing attempted to start construction again, prompting CRMC to issue a "Cease and Desist" order on June 27. (See id. ¶ 25(e).) The order itself was not appealable, and did not attach any "notice of violation" that would carry the right to a hearing. (See id. ¶ 25(f).) On July 15, 2009, Downing formally requested a hearing on the order; and on August 6, it asked again for a final decision about the land. (See id. ¶¶ 25(f)-(g).) CRMC did not respond before August 24, when Downing filed this action against the state, CRMC, HPHC, and various officials.[1]

The Complaint raises the following constitutional and state law causes of action: (i) a "taking" of property without just compensation in violation of the Fifth Amendment; (ii)

_____

[1] Perhaps as a result of the Complaint, the parties now appear to have made some progress. In late February, both sides agreed that the matter would be referred to a CRMC subcommittee for an expedited hearing. However, since they have not yet reached a full resolution or consented to dismiss the case, the controversy raised by Defendants' motion is still active. Plus, if anything, this development strengthens the Court's decision. It provides evidence that Downing cannot satisfy the finality prong of Williamson County Reg'l Planning Comm'n v. Hamilton Bank of Johnson City, 473 U.S. 172 (1985), which the Court explains below.

violations of substantive and procedural due process; (iii) denial of the right to equal protection; (iv) a conspiracy to interfere with civil rights in violation of 42 U.S.C. § 1985; (v) violations of state constitutional provisions assuring due process and equal protection; and (vi) intentional interference with business relations.

Defendants move to dismiss the case for lack of subject matter jurisdiction. They contend that all the claims boil down to the first one: the accusation that Defendants have "taken" Downing's property without just compensation. This claim, they argue, should have been brought in state court under prudential principles articulated in Williamson County Reg'l Planning Comm'n v. Hamilton Bank of Johnson City, 473 U.S. 172 (1985). Because Downing failed to bring the claim in the proper forum, Defendants assert, this lawsuit is not ripe for resolution in federal court. Downing responds to this deflection by claiming that Rhode Island law does not provide a "reasonable, certain and adequate provision for obtaining compensation," Williamson County, 473 U.S. at 194, and, therefore, that it is entitled to skip the state forum and proceed directly to federal court with its constitutional takings claim.

II. The Takings Claim

For the reasons set forth below, Defendants are correct that Downing's takings claim is unripe and must be dismissed.

To explain why, and to properly frame the dispute, the Court must first summarize the Supreme Court's holding in <u>Williamson County</u>, First Circuit law interpreting that case, and Rhode Island takings law.

A.   The <u>Williamson County</u> ripeness doctrine

<u>Williamson County</u> erected two hurdles to bringing a takings claim in federal court.   First, the government must have "arrived at a final, definitive position" about how the allegedly taken land will be treated.   <u>Williamson County</u>, 473 U.S. at 190-91.   If any steps remain before it is clear that a "taking" has occurred, such as the ability to apply for a variance, <u>see</u> <u>id.</u>, the property owner may not bring a federal lawsuit.

Second, assuming a final decision has been reached, a plaintiff still may not sue in federal court if he has failed to avail himself of a "reasonable, certain and adequate provision for obtaining compensation" from the state.   <u>Id.</u> at 194.   This is because "the Constitution does not require pretaking compensation, and is instead satisfied by a reasonable and adequate provision for obtaining compensation after the taking." <u>Id.</u> at 195.   In <u>Williamson County</u>, the plaintiff alleged that a county in Tennessee passed zoning measures that resulted in a taking of its property.   The Supreme Court observed that, under Tennessee law, "a property owner may bring an inverse

condemnation action to obtain just compensation for an alleged taking of property under certain circumstances." Id. at 196. "[I]nverse condemnation" refers to a property owner's action for compensation when "a governmental entity . . . takes . . . property in fact without formally exercising the power of eminent domain." Annicelli v. South Kingstown, 463 A.2d 133, 139 (R.I. 1983). The plaintiff in Williamson County had "not shown that the inverse condemnation procedure" provided by state law was "unavailable or inadequate." Williamson County, 473 U.S. at 196-97. The Supreme Court therefore held that "until [the plaintiff] has utilized that procedure, its taking claim is premature." Id.

For convenience, the Court will refer to the first prerequisite as the "finality" requirement, and the second as the "state action" requirement. Because both requirements must be met, the Court may address them in any order. See id. at 194 (discussing the state action requirement as "[a] second reason the taking claim is not yet ripe"). In this case, because Downing fails to establish the state action requirement, and it is dispositive of the dispute, the Court turns there first.

In enforcing the state action requirement, the First Circuit has placed a "heavy burden" on plaintiffs asserting takings claims to prove the "unavailability or inadequacy" of state remedies. Deniz v. Municipality of Guaynabo, 285 F.3d 142, 146

(1st Cir. 2002); see also Gilbert v. City of Cambridge, 932 F.2d 51, 65 (1st Cir. 1991) (stating that a property owner who brings a takings claim in federal court "has the burden of proving the inadequacy" of state remedies). "[I]f it is unclear whether a particular state-law remedy pertains, the claimant must attempt to exploit it — and his federal takings claim will not be deemed ripe unless and until he has pursued, and exhausted, that course." Deniz, 285 F.3d at 146. Thus, in Deniz, the First Circuit was not troubled by ambiguity about whether the plaintiff could obtain compensation under Puerto Rico law:

> If the plaintiff were to pursue the inverse condemnation remedy, the local courts would be presented with an issue of first impression under Puerto Rico law. Until he travels that road, the availability vel non of the inverse condemnation remedy remains open to question. . . . Consequently, his . . . takings claims are unripe.

Id. at 147; see Culebras Enters. Corp. v. Rivera Rios, 813 F.2d 506, 514-15 (1st Cir. 1987) (finding that despite a "[l]ack of clarity" in Puerto Rico case law, the plaintiffs had "certainly not proven the inadequacy of [Puerto Rico's] inverse condemnation remedy," and their claim was not ripe); Ochoa Realty Corp. v. Faria, 815 F.2d 812, 816-17 (1st Cir. 1987) (affirming dismissal of taking claim because, as Culebras found, Puerto Rico was "prepared to recognize the general availability" of an inverse condemnation remedy).

B.  Adequacy of inverse condemnation under Rhode Island
law

There is no dispute that the Rhode Island Supreme Court recognizes a cause of action for inverse condemnation. "Governmental action short of actual acquisition of property may be a constructive taking or an inverse condemnation within the meaning of the Fifth and Fourteenth Amendments." E & J Inc. v. Redevelopment Agency of Woonsocket, 405 A.2d 1187, 1189 (R.I. 1979). The cause of action is rooted in both the United States and Rhode Island Constitutions. See Annicelli, 463 A.2d at 139; L.A. Ray Realty v. Town Council of Cumberland, 698 A.2d 202, 218-19 (R.I. 1997). In recent years, plaintiffs have successfully employed the state inverse condemnation remedy to recover compensation for regulatory takings. See, e.g., Woodland Manor, III Assocs., L.P. v. Reisma, No. C.A. PC89-2447, 2003 WL 1224248, at *17-21 (R.I. Super. Feb. 24, 2003) (awarding damages and prejudgment interest in judgment for plaintiff on inverse condemnation claim).

On its face, the First Circuit's decision in Pascoag Reservoir & Dam, LLC v. Rhode Island looks like a trapdoor straight to state court for Downing. 337 F.3d 87, 92 (1st Cir. 2003). There, the First Circuit approved of Rhode Island's inverse condemnation remedy as adequate under Williamson County. The case involved a takings claim filed in this District arising

out of an easement obtained by a state agency. The court
explained what plaintiffs must demonstrate to bypass the state
action requirement in takings cases:

> [The plaintiff's] burden [in a federal takings case]
> is to show that one of the narrow exceptions to the
> state action requirement applies. The Supreme Court
> in Williamson County identified two exceptions–where
> state remedies were "unavailable" or "inadequate."

Id. at 92 (internal citations omitted). The First Circuit then
considered whether the plaintiff could show that an inverse
condemnation lawsuit under Rhode Island law would not suffice.
Citing Annicelli and E & J, it answered as follows:

> [The plaintiff] cannot show that Rhode Island's
> remedies were inadequate or unavailable. The Rhode
> Island Constitution prohibits the taking of private
> property for public use without just compensation and
> Rhode Island state courts have long allowed recovery
> through suits for inverse condemnation.

Pascoag Reservoir & Dam, 337 F.3d at 93; accord Q.C. Constr. Co.
v. Verrengia, 700 F. Supp. 86, 90 (D.R.I. 1988) (finding that
because the Rhode Island Supreme Court had "unequivocally held
that one deprived of property through a taking by regulation is
entitled to just compensation," the plaintiffs had "failed to
show that . . . compensation" through a state lawsuit was
unavailable).

    C.   Majority opinion in Flores Galarza

Until recently there would have been no reason to even
question the binding effect of Pascoag Reservoir & Dam. To

escape it, Downing now clings to the majority opinion in the more recent _Flores Galarza_ case, which arguably narrowed the state action requirement.

In _Flores Galarza_, an insurance company alleged that Puerto Rico's treasury department effected a taking by appropriating funds under a compulsory liability law. See _Flores Galarza_, 484 F.3d at 6. The majority announced a strict standard for when a state remedy may be considered "adequate": it must make available "a process that is particularly aimed at providing compensation when government action effects a taking." _Id._ at 16. Most dramatically, the opinion declared that "such procedures do not include litigation of a state takings claim or any general remedial cause of action under state law." _Id._ at 17. The Court explained:

> Rather, [_Williamson County_] must have had in mind only those procedures specifically designed by the state to avoid constitutional injury in the first instance by providing a means for a plaintiff to obtain compensation for the government's taking of property.
> An inverse condemnation cause of action is a classic example of such a particularized procedure; it gives a property owner aggrieved by government conduct the opportunity to obtain compensation, thereby avoiding an unconstitutional taking.

_Id._ "By contrast," the Court continued, "generally available state procedure[s]" do not trigger the state action requirement. _Id._

The Court found Puerto Rico's remedies fell in the latter category: "no Commonwealth administrative process or cause of action has been identified through which a claimant is expected to seek compensation in the unusual circumstance of . . . the government's appropriation of funds." Id. at 19. The majority thus considered Puerto Rico's general takings liability regime insufficient under the circumstances. Yet, strangely the Court did not cite Deniz or Culebras, two decisions in which the First Circuit had concluded that takings claimants failed to demonstrate the inadequacy of the Commonwealth's inverse condemnation remedy. Indeed, the majority in Flores Galarza arguably shifted the burden with respect to the state action requirement by faulting the defendant for failing to "identif[y]" a particularized procedure through which the plaintiff could obtain compensation. Id. at 19.

The result, Downing argues, is that Flores Galarza opened the door to more takings lawsuits in federal courts. This is one such case, it says, because Rhode Island law flunks the new standard for "reasonable and adequate" state procedures. Downing urges the Court to disregard the semantic similarity between Rhode Island's remedy and the "inverse condemnation cause of action" that the majority described as a "classic example" of an adequate procedure. Id. at 17. In Rhode Island, Downing proclaims, inverse condemnation is "squarely [a] state

takings claim[]"— in other words, a "generally available state procedure." (Pl.'s Mem. at 15, 20.) The <u>Flores Galarza</u> majority's discussion of "general" takings claims makes this clear, according to Downing:

> We consider a state takings claim to be remedial in nature, however, and not a procedure the State has provided for seeking compensation. A takings claim seeks damages for the unconstitutional taking of property without due compensation. By contrast — as discussed above — an inverse condemnation proceeding is designed to enable plaintiffs to obtain compensation — which, if granted, would <u>avoid</u> the alleged constitutional violation that the takings claim is intended to remedy.

<u>Flores Galarza</u>, 484 F.3d at 18 (emphasis in original) (internal quotations and citation omitted).

Downing's argument goes like this: the Rhode Island inverse condemnation remedy sounds in federal and state constitutional law. <u>See</u> <u>Annicelli</u>, 463 A.2d at 139 (discussing inverse condemnation under the United States and Rhode Island Constitutions). Therefore, any successful claim must presuppose an unlawful deprivation of property without compensation; the cause of action could not exist without it. The state remedy is thus "remedial in nature," and inadequate.

What would instead be required, Downing suggests, is some sort of agency valuation process for the stalled development of its land, which would stand between the state's action and the inverse condemnation action. There is no dispute that such a

process does not exist. In the absence of such a procedure, Downing maintains that the state action requirement does not apply in Rhode Island — notwithstanding the plainly contrary finding in Pascoag Reservoir & Dam — because an inverse condemnation lawsuit would be "inadequate," and an adequate procedure is "unavailable." To put a fine point on it, Downing's essential pitch is that Pascoag Reservoir & Dam is no longer good law in the face of Flores Galarza. The Court now turns to whether that is the case.

> D. How broadly should Flores Galarza be read?
>
> > 1. Did the Flores Galarza majority overrule Pascoag Reservoir & Dam?

Without question, the majority in Flores Galarza took a different approach to Williamson County than earlier First Circuit decisions. It may be fair to presume that the majority intended to reinterpret the general standards for assessing the ripeness of takings claims in this Circuit. But even if that is true, there is no basis to further conclude that Flores Galarza overruled the specific conclusion about Rhode Island law reached in Pascoag Reservoir & Dam: because "Rhode Island state courts have long allowed recovery through suits for inverse condemnation," a takings plaintiff in this state cannot avoid the state action requirement. Pascoag Reservoir & Dam, 337 F.3d at 93.

To begin with, the <u>Flores Galarza</u> majority did not discuss or cite <u>Pascoag Reservoir & Dam</u>, and the adequacy of Rhode Island's inverse condemnation remedy was not an issue before the Court. Indeed, the majority even acknowledged that common law inverse condemnation remedies, such as Rhode Island's, might be sufficient: "Our view does not exclude the possibility that a state explicitly could create a non-statutory inverse condemnation procedure." <u>Flores Galarza</u>, 484 F.3d at 18 n.21.

Moreover, to the extent that the majority opinion raised questions about <u>Pascoag Reservoir & Dam</u>, a subsequent order denying rehearing <u>en</u> <u>banc</u> in <u>Flores Galarza</u> eliminated any doubt that the earlier case is still good law. While declining to reconsider the dispute, the <u>en</u> <u>banc</u> order included a statement from three Circuit Judges that suggested the majority's restrictive reading of <u>Williamson County</u> was unjustified:

> It appears to us that the panel majority decision likely conflicts directly with binding Supreme Court authority and prior decisions in this court, as well as the law in other circuits. If so, a panel majority lacks the authority to so conclude.

<u>Id.</u> at 41 (Order denying reh'g) (footnotes omitted).[2] In a footnote, the statement identified the "prior decisions in this court" in conflict with the earlier majority to be <u>Deniz</u> and <u>Pascoag Reservoir & Dam</u>. <u>Id.</u> at 40 n.2. Thus, the statement in

---

[2] A statement such as this one is a not-so-subtle way of planting a red flag next to a problematic holding.

the new order opined that the majority "lacke[d] the authority" to deviate from Pascoag Reservoir & Dam.

This Court has no more authority to depart from Pascoag Reservoir & Dam than the majority in Flores Galarza. If that means the First Circuit's conclusion about Rhode Island law is binding on the Court, this dispute is settled. Downing's takings claim must be dismissed, because it is precluded from showing that the inverse condemnation remedy recognized by E & J and Annicelli is "unavailable" or "inadequate." However, as explained below, even if Pascoag Reservoir & Dam leaves some leeway for Downing to challenge the adequacy of the state remedy under these circumstances, it still cannot prevail.

    2.   Does Flores Galarza alter the Williamson County
         requirements in the First Circuit?

To give Downing's argument here the benefit of every doubt, it could be that the analysis of Rhode Island law contained in Pascoag Reservoir & Dam should not directly control this dispute. A narrower, and not completely unreasonable, interpretation of the case is that the plaintiff there simply had not demonstrated the inadequacy of Rhode Island's remedy of inverse condemnation to redress its particular injury under the specific circumstances presented. See Pascoag Reservoir & Dam, 337 F.3d at 93. State law can evolve, and Williamson County arguably vouchsafes the opportunity for Downing to show Rhode

Island law offers no help in this case, notwithstanding its applicability to previous takings claimants. See Williamson County, 473 U.S. at 195-97 (discussing the "reasonable and adequate" remedy requirements). The question then becomes whether Flores Galarza lightened Downing's burden, either by limiting the state action requirement to situations where "particularized procedures" are available, or imposing on Defendants the duty to demonstrate that Rhode Island's inverse condemnation remedy remains adequate. The Court rejects the invitation to strain to find a way to apply Flores Galarza in this manner, for several reasons.

First, both the statement issued with the en banc order denying rehearing in Flores Galarza and the concurrence criticize the majority's application of Williamson County so substantially that it is questionable whether the holding has any precedential application at this point. As noted, the later statement found that the majority decision "conflicts directly" with Supreme Court precedent. Id. at 40. It elaborated on the state action requirement:

> In our view, a federal takings claim, which is what has been presented here, is not ripe until a plaintiff seeks compensation from the state — unless it is manifest that there is no possibility of receiving such compensation in any state proceeding.

Id. at 40-41.  These statements echoed the concurring opinion, which took issue with the majority's "treatment of the ripeness issue":

> There is no support in Supreme Court precedent for the conclusion that claimants are relieved of the [state] litigation requirement unless the state has adopted specific processes (presumably by way of statute) through which such compensation may be recovered.  Indeed, Williamson County suggests just the opposite.  The Williamson County Court derived the [state] litigation rule from procedural due process cases holding that a plaintiff does not have a due process claim "unless or until the state fails to provide an adequate remedy for the property loss." [Williamson County], 473 U.S. at 195 . . . (citing Hudson v. Palmer, 468 U.S. 517, 532 n.12 . . . (1984)). . . . [T]he causes of action recognized as adequate in Hudson are exactly the sort of "general remedial causes of action under state law" that the lead opinion deems insufficient here.

Id. at 38 (Howard, C.J., concurring in the judgment).  These critiques effectively eviscerate the majority's conclusion that the ability to "litigat[e] . . . a state takings claim" is inadequate under Williamson County.  Id. at 17.

Second, the majority opinion also appears to collide with more recent commentary from the Supreme Court in San Remo Hotel v. City and County of San Francisco, 545 U.S. 323 (2005).  A central rationale for the majority's holding in Flores Galarza was the risk that claim preclusion would prevent property owners from ever "asserting their federal takings claims in federal court," if required first to bring state takings lawsuits. Flores Galarza, 484 F.3d at 17 (quoting San Remo Hotel, 545 U.S.

17

at 351 (Rehnquist, J., concurring)). This worry comes from Justice Rehnquist's concurrence in San Remo Hotel. The majority in that case, however, stated a different view. In light of Williamson County, the Court observed that it was "hardly a radical notion . . . that, as a practical matter, a significant number of plaintiffs will necessarily litigate their federal takings claims in state courts." San Remo Hotel, 545 U.S. at 346.

Third, some of the authority relied on by the Flores Galarza majority denounces both San Remo Hotel and Williamson County itself. The majority cited one law review article that not only sides with Justice Rehnquist's concurrence in San Remo Hotel, but contends that Williamson County was wrongly decided. See J. David Breemer, You Can Check Out But You Can Never Leave: The Story of San Remo Hotel-the Supreme Court Relegates Federal Takings Claims to State Courts under a Rule Intended to Ripen the Claims for Federal Review, 33 B.C. Envtl. Aff. L. Rev. 247, 299 (2006) (attacking the "irredeemably flawed and unnecessary state procedures requirement" of Williamson County). If nothing else, this reveals the difficulty of reconciling a broad reading of Flores Galarza with the Williamson County prudential principles, which the Supreme Court has never disturbed.[3]

_____

[3] The regime proposed by Flores Galarza is intriguing from a federalism standpoint. The federal government would seem to

If _Flores Galarza_ has any vitality at all, it may be reasonable to view it as stating an exception to _Williamson County_ applicable only to its unique set of facts. The _Flores Galarza_ majority emphasized the "unusual circumstance" of the plaintiff's takings claim: the "direct appropriation of funds" by the government. _Flores Galarza_, 484 F.3d at 19. That type of injury, the majority observed, mimicked the taking alleged in _Eastern Enters. v. Apfel_, 524 U.S. 498, 504 (1998), in which coal companies challenged a statute obligating them to pay employees' health care premiums. In _Eastern Enters._, the government argued that the plaintiffs were first required to pursue compensation under the Tucker Act, which is the normal procedure for takings claims against the federal government.

---

possess an interest in having the takings clause enforced in federal court, if for no other reason than to avoid the inevitable disparate holdings of state supreme courts in favor of a more predictable and uniform federal jurisprudence. On the other hand, offering a sufficiently "particularized" and streamlined procedure for compensation would serve the state interest in avoiding constitutional violations in the first instance, without ruling out a federal lawsuit. This balance of interests has some appeal, but is ultimately forbidden by the _Williamson County_ framework. Moreover, the approach of _Williamson County_ is not unique; in other areas of law, there is no federalism problem with allocating an entire class of constitutional claims to state court in the first instance. One such example is the exhaustion requirement for habeas corpus petitions filed by state prisoners, which furthers the states' interest in protecting criminal convictions. See O'Sullivan v. Boerckel, 526 U.S. 838, 845 (1999) (explaining that the exhaustion requirement is a "rule of comity" that is "designed to give the state courts a full and fair opportunity to resolve federal constitutional claims before those claims are presented to the federal courts"); 28 U.S.C. § 2254(b)(1), (c).

See id. at 521. The plurality opinion, however, found that such a requirement would be absurd. The asserted taking involved the "direct transfer of funds" to the government. Id. at 521 (quotation marks and citation omitted). Thus, a Tucker Act claim would "entail an utterly pointless set of activities," because "every dollar paid pursuant to [the] statute would be presumed to generate a dollar of Tucker Act compensation." Id.

By the same logic, the Flores Galarza majority found that forcing a plaintiff whose money had been confiscated to seek dollar-for-dollar compensation via a state remedy would be "pointless." See Flores Galarza, 484 F.3d at 19-20. Why allow the state to take money away with one hand, and yet deny a constitutional challenge because the victim could petition to get it back from another? Given this line of reasoning, Defendants argue in the alternative that all Flores Galarza means (if it means anything) is that the state action requirement does not apply when the state appropriates currency. Accordingly, Flores Galarza would have no impact here, where the alleged taking involves real property instead of money.

Downing of course disagrees with this construction, and asserts that Flores Galarza should not be limited to its facts. It points out that the only First Circuit case yet to discuss Flores Galarza, Garcia-Rubiera v. Calderon, 570 F.3d 443, 453 (1st Cir. 2009), does not explicitly restrict the reach of the

majority opinion to direct takings of funds. This may be true, but neither does Garcia-Rubiera suggest that Flores Galarza should be read broadly. It does not employ, or even cite, the "particularized procedure" standard. And it does, in fact, discuss Flores Galarza in the context of "circumstances . . . 'that involve[] the direct appropriation of funds.'" Id. at 453 (quoting Flores Galarza, 484 F.3d at 19). Garcia-Rubiera thus does not override the emasculating commentary contained in the statement issued with the subsequent en banc order denying rehearing in Flores Galarza, and does not convince the Court that extending the majority view to the circumstances of this case would be warranted.

In sum, the Court disagrees that Flores Galarza achieved the "shift" in First Circuit law that Downing describes. (See Pl.'s Mem. at 15.) To the extent that it can be interpreted as turning Williamson County on its head, effectively creating a presumption of inadequacy that the state must overcome by identifying sufficiently "particularized procedures," the Court accepts the assurance of the statement accompanying the subsequent order that the majority "lack[ed] the authority" to take that step. Flores Galarza, 484 F.3d at 40-41. As a result, Downing cannot evade the general standards from Pascoag Reservoir & Dam and Deniz for applying Williamson County.

E. Plaintiffs fail to show that Rhode Island's inverse condemnation cause of action is unavailable or inadequate

The discussion above requires rejecting Downing's first offensive against the inverse condemnation remedy in Rhode Island — that, under <u>Flores Galarza</u>, state law takings claims are <u>ipso facto</u> inadequate. The question then becomes whether the state remedy is adequate and available in this case.

As noted, the Court might reasonably decline to read <u>Pascoag Reservoir & Dam</u> as proclaiming, once and for all, that the Rhode Island remedy is adequate in all circumstances. Even so, the fact remains that <u>Pascoag Reservoir & Dam</u>, as well as other decisions in the First Circuit, have found generally available inverse condemnation lawsuits in state court to satisfy the state action requirement, in Rhode Island and elsewhere. <u>See</u> <u>Pascoag Reservoir & Dam</u>, 337 F.3d at 93; <u>Q.C. Constr.</u>, 700 F. Supp. at 90; <u>Deniz</u>, 285 F.3d at 146; <u>Culebras</u>, 813 F.2d at 515; <u>Ochoa Realty</u>, 815 F.2d at 816-17. Since <u>Pascoag Reservoir & Dam</u>, the Rhode Island Supreme Court has not pared back the inverse condemnation cause of action, which takings claimants continue to plead. <u>See, e.g.</u>, <u>Woodland Manor</u>, 2003 WL 1224248, at *17-21 (finding for the plaintiff in an inverse condemnation suit); <u>Palazzolo v. State</u>, No. WM 88-0297, 2005 WL 1645974, at *15 (R.I. Super. July 5, 2005) (recognizing inverse condemnation claim but finding the plaintiff failed to

establish a compensable taking). These authorities support the conclusion that Rhode Island continues to offer available and adequate means to seek compensation for takings.

Can Downing nevertheless substantiate any specific flaws with the state remedy that would carry the "heavy burden" to prove inadequacy? See Deniz, 285 F.3d at 146. In the Court's view, the answer is no. Downing first cites sovereign immunity as a barrier to obtaining damages against the state. However, it is not clear that, as Downing argues, damages would be limited to $100,000 under R.I. Gen. Laws § 9-31-2, which provides a limited immunity waiver. As L.A. Ray Realty — the case Downing cites for the damages limitation — demonstrates, the damages cap applies in tort actions, but not to § 1983 and constitutional claims. That case approved total awards of more than $300,000 and $700,000 for plaintiffs on the basis of due process violations. See L.A. Ray Realty, 698 A.2d at 214. Even more to the point, as the partially concurring and partially dissenting opinion observed, an inverse condemnation action under the Rhode Island constitution "would not be subject to the statutory cap on tort claims against state and municipal entities," because the cap does not apply to "constitutional claims." Id. at 218-19. This statement does not conflict with anything in the majority opinion, and the Court has located no case that applies § 9-31-2 to an inverse condemnation claim.

Accordingly, even assuming the cap would compromise the adequacy of the state claim if it applied, it is "unclear" whether that is the case. _Deniz_, 285 F.3d at 146. Downing's takings claim thus "will not be deemed ripe unless and until [it] has pursued" damages above the $100,000 limit. _Id._

Second, Downing complains that the state remedy is inadequate because it may not provide for attorneys' fees. This proposition conflicts with the principle that state remedies need not offer all the same components of relief that federal claims do to be considered adequate. "Although the state remedies may not provide the respondent with all the relief which may have been available if he could have proceeded under [federal law], that does not mean that the state remedies are not adequate to satisfy the requirements of due process." _Culebras_, 813 F.2d at 514 (quoting _Parratt v. Taylor_, 451 U.S. 527, 544 (1981)). Thus, "[s]o long as [the owner receives] just compensation," which Downing has not shown to be unavailable under Rhode Island law, the absence of attorneys' fees would not prove inadequacy. _Id._

F.   Conclusion

For the reasons stated above, Downing's takings claim is unripe under _Williamson County_ and must be dismissed. The Court therefore need not reach the question of whether Downing could also satisfy the finality prong of that case, since each prong

standing alone imposes a necessary precondition to bringing a federal claim.

III. Remaining Claims

The next question is whether the Court has jurisdiction over any of Downing's remaining claims.  Defendants contend that all of them are nothing more than the takings claim dressed in different clothes, and they are therefore also unripe under Williamson County.  For the reasons explained below, the Court agrees.

As a corollary of Williamson County, a number of courts have recognized that the ripeness doctrine must also apply to claims that are "coextensive" with takings claims.  See Rocky Mountain Materials & Asphalt, Inc. v. Bd. of County Comm'rs of El Paso County, 972 F.2d 309, 311 (10th Cir. 1992) ("This alleged deprivation is exactly the same one that [the plaintiff] asserts has resulted in the complete taking of its property . . . . Under these circumstances, [the plaintiff] must first [make use of state procedures] . . . before its procedural due process claim may be considered ripe for determination."); Bigelow v. Michigan Dep't of Natural Res., 970 F.2d 154, 160 (6th Cir. 1992) ("The key issue in this case [for the due process claim] is whether the state properly denied full compensation to the plaintiffs . . . .  Such an issue . . . should . . . be subject to a ripeness inquiry."); see also Goldfine v. Kelly, 80 F.

Supp. 2d 153, 159 (S.D.N.Y. 2000) (applying the same ripeness analysis to taking, due process, and equal protection claims that "ar[ose] out of the same nucleus of facts").

Thus, in _Deniz_, the First Circuit refused to allow a substantive due process claim to proceed where the plaintiff's takings claim was unripe. See _Deniz_, 285 F.3d at 149. "Dressing a takings claim in the raiment of a due process violation does not serve to evade the exhaustion requirement" of _Williamson County_. _Id._ If this were not the rule, then plaintiffs could "effectively [] circumvent the ripeness requirement . . . simply by attaching" other legal theories to complaints that, in substance, allege no more than a takings claim. _Bigelow_, 970 F.2d at 160.

Downing offers no authority or argument that the ripeness doctrine should be strictly limited to its takings claim. Accordingly, any counts in the Complaint that are "coextensive" with the takings claim should be subject to the same ripeness requirements. _Rocky Mountain Materials_, 972 F.2d at 311. Under this standard, the Court has little trouble concluding that Downing cannot pursue the federal and state procedural due process claims, the state takings claim, and the intentional interference claim. Judging by the Complaint, the "key issues" for those causes of action are the same as the ones applicable to the alleged taking. See _Bigelow_, 970 F.2d at 160. Although

the formal elements of the claims may differ, each will depend, broadly, on demonstrating the truth of the allegations contained in paragraphs 25-36 of the Complaint, the gist of which is that Defendants harmed Downing financially by interfering with the development of its property.[4] (See Compl. ¶¶ 25-36.)

At first glance, the counts alleging a § 1985 conspiracy, a violation of substantive due process, and a deprivation of the right to equal protection might seem to warrant a different analysis. These claims incorporate some elements of proof that do not fit cleanly within the framework of a takings claim. For instance, to make out a substantive due process violation, Downing here would not only have to "prove that [it] suffered the deprivation of an established . . . property interest," but also "that such deprivation occurred through governmental action that shocks the conscience." Clark v. Boscher, 514 F.3d 107, 112 (1st Cir. 2008). Similarly, for an equal protection claim in this context, Downing would need to show that there is evidence of "bad faith or malicious intent to injure" on the part of Defendants. Yerardi's Moody St. Rest. & Lounge, Inc. v. Bd. of Selectmen of Randolph, 932 F.2d 89, 94 (1st Cir. 1991).

_____

[4] For instance, the elements of an intentional interference claim under Rhode Island law boil down to proving that a defendant has frustrated a business expectancy possessed by the plaintiff, and thereby caused it damages. See Avilla v. Newport Grand Jai Alai LLC, 935 A.2d 91, 98 (R.I. 2007).

In either case, Downing would have to demonstrate some level of egregious or malicious conduct.

The proof necessary for the conspiracy claim appears to stray even further from the takings count. Downing would not only need to demonstrate an agreement among two or more Defendants, but would have to identify "some racial, or perhaps otherwise class-based, invidiously discriminatory animus behind the conspirators' action." Perez-Sanchez v. Pub. Bldg. Auth., 531 F.3d 104, 107 (1st Cir. 2008) (quotation marks and citation omitted).

It is conceivable that these unique elements of proof could protect the remaining theories of liability, if Downing contended that it truly seeks to rely on them. But it does not, leaving the Court to judge for itself whether those claims are "bona fide." Patel v. City of Chicago, 383 F.3d 569, 573 (7th Cir. 2004). As Patel illustrates, in such circumstances it is appropriate to consider whether the allegations in a complaint support the supposedly distinct claims.

> [W]e conclude that the [p]laintiffs have merely re-
> labeled their takings claim as an equal protection
> claim, presumably to avoid Williamson County's
> ripeness requirement. The [p]laintiffs' first amended
> complaint makes clear that their equal protection
> claim is not based on membership in a protected class,
> which would render Williamson County's ripeness
> requirements inapplicable. . . . We have explained
> that if plaintiffs' only real claim is that the
> governmental entity has rendered their business
> worthless, then pursuant to the rule of Williamson

<u>County</u> they must go to state court because their claim
was truly (and solely) one for a taking.

<u>Id.</u> at 573 (emphasis in original) (internal quotation marks,
alterations, and citation omitted).

Here, the Complaint arguably contains some allegations that
would tend to show an agreement between HPHC and CRMC. (<u>See</u>
Compl. ¶¶ 21-24.) However, it does not identify any
"invidiously discriminatory animus," and at a minimum does not
clearly set forth how Defendants' conduct may be considered
malicious or conscience-shocking. Instead, the allegations
focus on the ways that Defendants' actions have stymied
development of the Narragansett land parcel. The Complaint thus
demonstrates that the equal protection, conspiracy, and
substantive due process claims are "ancillary to th[e] main
issue."[5] <u>Bigelow</u>, 970 F.2d at 160; <u>see</u> <u>Adrian v. Town of</u>
<u>Yorktown</u>, No. 03 Civ. 6604(MDF), 2007 WL 1467417, at *6-7
(S.D.N.Y. May 16, 2007) (explaining that "[p]laintiffs'
complaint and the way in which they have framed the allegations
therein" showed that a procedural due process claim was "merely
another avenue by which [p]laintiffs seek redress for the . . .
taking"). Downing has merely "[d]ress[ed] a takings claim" in
several other costumes, just as the plaintiff in <u>Deniz</u> attempted

---

[5] The Court expresses no opinion on whether Plaintiff has
stated a claim on which relief may be granted for any counts in
the Complaint.

to do.  _Deniz_, 285 F.3d at 149.   Accordingly, none of the additional claims can escape dismissal on ripeness grounds.[6]

IV.  Conclusion

For the reasons stated above, Defendants' motion is GRANTED and each of Downing's claims is hereby dismissed.

IT IS SO ORDERED.


_/s/ William E. Smith_
William E. Smith
United States District Judge
Date:  March 26, 2010

---

[6] Downing will have to seek relief in a state forum.  The colloquy at oral argument indicated that there are avenues it might pursue other than an inverse condemnation lawsuit. Downing raises questions about the jurisdiction of CRMC, which has "power over the state's environmental resources," but no statutory authority to enforce archaeological or historical interests.  See _In re Request for Advisory Opinion from House of Representatives (Coastal Resources Management Council)_, 961 A.2d 930, 941 (R.I. 2008) (discussing R.I. Gen. Laws § 46-23-18.4). As a practical matter, CRMC controls permits for developing coastal areas, which puts it in the position to raise historical concerns at the suggestion of agencies like the HPHC.  The issue of whether CRMC's activities in this case stray beyond its authority may be appropriate for review in Rhode Island Superior Court on a petition for writ of mandamus, or an action for equitable estoppel.  See _Greenwich Bay Yacht Basin Ass'n v. Brown_, 537 A.2d 988, 991-92 (R.I. 1988) (finding that a petition for mandamus would only provide grounds for challenging the actions of the CRMC only if it had a "ministerial" duty to perform an act "without discretion to refuse," but that equitable estoppel could provide relief if "justice would so require").